IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 11, 2017 Session

## IN RE DOUGLAS H.[1]

**Appeal from the Circuit Court for Robertson County**
**No. 74CC1-2015-CV-354      Ross H. Hicks, Judge**

_____

### No. M2016-02400-COA-R3-PT

_____

The legal custodians of Mother's two children filed this petition to terminate her parental rights to the children on grounds of abandonment and severe child abuse. We affirm the termination of Mother's parental rights to both children on at least one ground, but reverse as to some of the grounds found by the circuit court. We agree with the circuit court's decision that termination of Mother's parental rights is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

H. Garth Click, Springfield, Tennessee, for the appellant, Mollie H.

Jennifer L. E. Williams, Springfield, Tennessee, for the appellees, Jeffrey P. and Jessica P.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This case involves termination of the parental rights of Mollie H. ("Mother") to two of her children, Douglas H., born in September 2013, and Tailor H., born in August 2015. Although neither child's birth certificate identifies a father, all the parties in this

---

[1] This Court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

action stipulated that Howard H.[2] is Douglas's biological father and Derek M.[3] was Tailor's biological father.

Mother has a lengthy history of drug abuse that began as early as age sixteen. Shortly after Mother gave birth to Douglas, she began using methamphetamine daily and continued to do so through October 2014. On October 1, 2014, police responded to Mother's residence where they found Douglas and Mother with methamphetamine-producing paraphernalia. They arrested Mother, and she pled guilty to a Class D felony for unlawfully and feloniously permitting her home to be used for the manufacture of methamphetamine.

Following Mother's arrest, the Tennessee Department of Children's Services ("DCS") removed Douglas from Mother's custody due to allegations of drug exposure and environmental neglect resulting from an active methamphetamine lab located in Mother's residence. Mother tested positive for methamphetamine, amphetamine, and ecstasy at the time of the removal. Two days later, on October 3, 2014, DCS filed a petition in the Montgomery County Juvenile Court asking the court to find Douglas dependent and neglected and severely abused. DCS placed Douglas in the home of Jessica P. and Jeffrey P. ("the Petitioners") pursuant to an Immediate Protection Agreement ("IPA").[4] By executing the IPA, Mother agreed to complete several services requested by DCS, including alcohol and drug treatment, resolution of all pending criminal charges, stable employment, and random drug screens. Unfortunately, Mother continued to use drugs and struggled to comply with the requirements of the IPA. For example, between October 2014 and January 2015, Mother submitted to three drug screens and tested positive for methamphetamine and/or amphetamine and refused to submit to at least four drug screens. Mother also repeatedly cancelled visits with Douglas during this time.

In late 2014, Mother entered inpatient drug treatment but left without completing the program. She moved to Texas shortly after visiting Douglas on January 6, 2015. While Mother resided in Texas, she attempted no visits with Douglas but continually reported she would return to Tennessee. The juvenile court heard DCS's dependency and neglect petition on April 20, 2015. The court found by clear and convincing evidence that Douglas was dependent and neglected and the victim of severe child abuse. The juvenile court granted the Petitioners temporary legal custody of Douglas. Mother failed

---

[2] The trial court terminated Howard H.'s parental rights; he did not appeal.

[3] Derek M. died on August 11, 2015 and was never a party to this action.

[4] Misha Daniels, Tailor's DCS case manager, testified at the termination hearing that an IPA is a document that can be used when a child is removed from a parent's custody and "the parent indicates an agreement of placement with someone instead of foster care."

to attend the dependency and neglect hearing because she was incarcerated in Texas for shoplifting. She appealed the juvenile court's decision in order to obtain a de novo hearing.[5]

On June 4, 2015, the Petitioners filed a petition in the Robertson County Circuit Court for termination of Mother's parental rights and for adoption in regard to Douglas only. Thereafter, Mother returned to Tennessee and gave birth to Tailor in August 2015. DCS removed Tailor from Mother's custody directly from the hospital because Mother tested positive for methamphetamine when Tailor was born. Following the removal, DCS placed Tailor in the home of the Petitioners with her half-sibling, Douglas, pursuant to a second IPA. The second IPA required that Mother complete the same services identified in the first IPA and added that she continue receiving services to address her mental health issues.[6]

On August 11, 2015, DCS filed a petition in the Montgomery County Juvenile Court to find Tailor dependent and neglected and severely abused. While DCS's petition was pending in the juvenile court, the Petitioners filed an amended termination and adoption petition in the circuit court as to Douglas on December 16, 2015.[7] Mother continued to use drugs and struggled to complete the tasks in the IPA during this time. In fact, by April 20, 2016, Mother still had not completed any of the tasks in the IPA. She successfully completed one inpatient drug treatment program but failed to follow through with treatment recommendations. She submitted to drug screens and tested positive for illegal substances on at least three occasions; the last occurred in February 2016 when Mother tested positive for marijuana. Mother failed to respond to at least two requests for drug screens.

The juvenile court heard DCS's petition on May 9, 2016 and adjudicated Tailor dependent and neglected based upon clear and convincing evidence, with a stipulated agreement by Mother to only dependency and neglect. The juvenile court made no findings on the issue of severe abuse.[8] Nine days later, on May 18, 2016, the Petitioners filed the first petition in the circuit court for termination of Mother's parental rights and for adoption in regard to Tailor. The Petitioners filed a final amended petition for termination of Mother's parental rights and adoption as to both children on June 21, 2016. Upon motion of the Petitioners, the circuit court consolidated the pending

---

[5] Other than a list of stipulated facts stating that Mother appealed the juvenile court's decision, the record contains no evidence regarding Mother's appeal.

[6] At trial, Mother testified that she had been diagnosed with depression, anxiety, panic disorder, and attention deficit disorder.

[7] The amended petition added the ground of severe child abuse.

[8] The trial court scheduled a dispositional hearing for May 23, 2016, but the hearing never occurred.

termination of parental rights and adoption cases for both children on July 5, 2016. On that same day, the circuit court also entered an order reflecting the parties' agreement on the terms of Mother's visitation with the children. The order permitted Mother to have supervised visitation with the children for one hour every other Saturday, provided that Mother submitted a negative drug screen on the Friday prior to the visit.

On September 22 and 28, 2016, the circuit court conducted a trial on the consolidated termination of parental rights and adoption cases. Agent Kyle Darnell, the lead clandestine lab investigator for the 19th judicial district drug task force, testified as the agent who responded to the crime scene at Mother's home on October 1, 2014. He testified as an expert witness due to his experience from working 200 clandestine labs as a clandestine lab technician since 2007. When asked to describe the scene at Mother's residence, Agent Darnell testified that, when he entered Mother's home, "there was standing water in the apartment" and "there were electrical cords plugged into outlets." Agent Darnell further testified that law enforcement found an active methamphetamine lab and various drug paraphernalia inside a backpack in the home where Mother resided with Douglas. He opined that the entire residence had been exposed to the methamphetamine manufacturing process, and he concluded that Douglas was undoubtedly exposed to the manufacture of methamphetamine while residing in the home.

Misha Daniels, the DCS worker assigned to Tailor's case, testified that Mother tested positive for drugs on several occasions, repeatedly refused to submit to drug screens, and infrequently visited the children. Ms. Daniels further testified that Mother reported obtaining employment and stable housing but did not provide DCS with any proof of her claims. Ms. Daniels stated that Mother remained noncompliant with the DCS-requested services at the time of trial.

Mother testified at length during the trial. She acknowledged her extensive history of drug abuse and that she used drugs within a month or two of Tailor's birth despite knowing she was close to delivering a child; however, she testified that she had not used drugs since October 2015. Mother further acknowledged her arrest in Tennessee for manufacturing methamphetamine and her incarceration in Texas for shoplifting. She conceded that she resided in at least twelve different residences since Douglas was born, and that she did not have a residence of her own at the time of trial. Mother testified that she lived with and paid rent to Darrell J., who tested positive for drugs. She acknowledged that she had not been compliant with her mental health treatment because she had not taken medication as prescribed and consistently failed to attend her mental health appointments. Mother testified, however, that she began regularly attending mental health appointments during the months preceding trial. She admitted that she failed to support her children financially following their removal from her custody.

- 4 -

Petitioner Jessica P. testified that the children are happy, well-adjusted, and bonded to the Petitioners. She further testified that the children resided in a stable, loving home where they knew only the Petitioners as parents. According to Jessica P., she maintained a calendar of the children's visits with Mother showing that Mother consistently missed visits and often arrived late when she did visit.

The circuit court entered an order on November 16, 2016 terminating Mother's parental rights to the children. The circuit court found clear and convincing evidence of the existence of five statutory grounds for termination of Mother's parental rights to Douglas: (1) abandonment by willful failure to visit during the four months prior to the filing of the original petition, (2) abandonment by willful failure to support during the four months prior to the filing of the original petition, (3) abandonment by willful failure to visit during the four months prior to the filing of the amended petition, (4) abandonment by willful failure to support during the four months prior to the filing of the amended petition, and (5) severe child abuse. The circuit court found clear and convincing evidence of the existence of three statutory grounds for termination of Mother's parental rights to Tailor: (1) abandonment by willful failure to visit during the four months preceding the filing of the original petition, (2) abandonment by willful failure to support during the four months preceding the filing of the original petition, and (3) severe child abuse.

On appeal, Mother presents three issues for our review. Those issues can be consolidated into two issues and restated as follows: (1) whether the trial court erred in finding by clear and convincing evidence that grounds existed to terminate Mother's parental rights, and (2) whether the trial court erred in determining that termination of Mother's parental rights was in the best interest of the children.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.3d 674, 678 (Tenn. 1994)). This right is not absolute, however. If a compelling state interest exists, the state may interfere with parental rights. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Nale*, 871 S.W.2d at 678). Our legislature has enumerated the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). The existence of any one of the enumerated grounds will support a termination of parental rights. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because terminating a parent's fundamental parental rights has severe consequences, termination cases require a court to apply a higher standard of proof. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006).

Consequently, a court must determine by clear and convincing evidence both that grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted)).

In light of the heightened standard of proof required in termination of parental rights cases, we must adapt the customary standard of review established by Tenn. R. App. P. 13(d). *Id.* In accordance with Tenn. R. App. P. 13(d), we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. *Id.* Next, we must determine whether the facts establish the existence of one or more grounds for termination by clear and convincing evidence. *In re M.J.B.*, 140 S.W.3d at 654.

ANALYSIS

I. Grounds for Termination

A. Abandonment

The circuit court terminated Mother's rights to both children pursuant to Tenn. Code Ann. § 36-1-113(g)(1), which provides that a parent's rights may be terminated if the parent abandoned his or her child. Tennessee Code Annotated section 36-1-102 provides several definitions of "abandonment" as a ground for termination of parental rights. In this case, the Petitioners specifically alleged that Mother abandoned both children by her willful failure to visit and her willful failure to support "as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i)." This subsection of the statute defines "abandonment" as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). A key component of the foregoing definition of abandonment is the willfulness of the parent's conduct. *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). The statutory definition of "willfully failed to visit" is "the

willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Tennessee Code Annotated section 36-1-102(1)(C) defines "token visitation" as "perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."

The statutory definition of "willfully failed to support" is "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Tennessee Code Annotated section 36-1-102(1)(B) defines "token support" as support that "is insignificant given the parent's means" in light of the circumstances of the case.

To prove that a parent acted willfully under this subsection, a petitioner must show that "a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

1. Douglas

The Petitioners filed the original petition to terminate Mother's parental rights to Douglas on June 4, 2015 and later amended the petition on December 16, 2015. In the order terminating Mother's parental rights, the circuit court found by clear and convincing evidence that Mother "abandoned [Douglas] by her willing failure to visit" and "her willing failure to pay child support" during "the four months preceding the filing of the original petition" and "the four months preceding the filing of the amended petition." It is clear from the wording of the order, that the circuit court terminated Mother's parental rights on the ground of abandonment as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i). When a court considers the ground of abandonment as defined in subsection (i), "the relevant period . . . is the four-month period immediately preceding the filing of the *original petition*." *Id.* (emphasis added); *see also In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003) (holding that "only a parent's conduct in the four months immediately preceding the filing of a petition then before the court may be used as grounds to terminate parental rights under Tennessee Code Annotated section 36-1-102(1)(A)(i)"). Thus, the circuit court should have considered Mother's conduct only during the four-month period prior to the filing of the original petition when it terminated Mother's parental rights based upon the ground of abandonment. We, therefore, reverse the circuit court's judgment terminating Mother's parental rights to Douglas based upon her conduct preceding the filing of the amended petition.

We turn now to the circuit court's termination of Mother's parental rights based upon abandonment by willful failure to visit and willful failure to support during the four-month period preceding the filing of the original petition. The relevant time period under Tenn. Code Ann. § 36-1-102(1)(A)(i) is February 4 to June 3, 2015. The testimony of Petitioner Jessica P. established that Mother neither paid child support nor visited Douglas during the four months prior to the filing of the original petition. The proof at trial showed that Mother moved to Texas and was incarcerated for a part of this four-month period. Specifically, Mother testified that she had been arrested on more than one occasion for shoplifting while residing in Texas. The record does not reflect how long Mother was incarcerated in Texas or the dates of her incarceration while there. However, the record shows that on April 20, 2015, Mother failed to attend the adjudication hearing in juvenile court regarding the dependency and neglect petition for Douglas because she was incarcerated in Texas on a shoplifting charge.

Having determined that Mother was incarcerated during a part of the four months preceding the filing of the original petition, we conclude that the definition of "abandonment" provided in Tenn. Code Ann. § 36-1-102(1)(A)(i) was not the definition applicable to this case. *See In re Colton R.*, No. E2016-00807-COA-R3-PT, 2017 WL 499439, at *9 (Tenn. Ct. App. Feb. 7, 2017) (stating that "this Court has repeatedly held that the definition of abandonment found in subsection (i) is inapplicable where the parent has been incarcerated during all or part of the four months preceding the filing of the termination petition."). The applicable definition of "abandonment" appears in Tenn. Code Ann. § 36-1-102(1)(A)(iv), which provides in pertinent part, as follows:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child *for four (4) consecutive months immediately preceding such parent's or guardian's incarceration* . . . .

(Emphasis added). This definition considers a different four-month period than the one considered in subsection (i). It "recognizes that an incarcerated parent has limited opportunities to visit or to earn money with which to pay support, making it difficult to show that such failures were willful." *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *9 (Tenn. Ct. App. Apr. 29, 2005).

In light of the foregoing, we conclude that the circuit court erred in applying the definition of "abandonment" contained in Tenn. Code Ann. § 36-1-102(1)(A)(i). We, therefore, reverse the circuit court's judgment terminating Mother's parental rights to Douglas based upon abandonment as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i).

2. Tailor

Using the definition of abandonment provided in Tenn. Code Ann. § 36-1-102(1)(A)(i) set forth above, we now proceed to address the circuit court's termination of Mother's parental rights to Tailor based on abandonment by willful failure to visit and willful failure to support. The Petitioners filed the original petition to terminate Mother's parental rights to Tailor on May 18, 2016 and later amended the petition on June 21, 2016. Thus, the relevant time period under Tenn. Code Ann. § 36-1-102(1)(A)(i) is January 18 to May 17, 2016.

During this period of time, Mother visited Tailor only once, on May 14, 2016. Petitioner Jessica P. testified that DCS set the parameters for Mother's supervised visits with the children. According to Jessica P., Mother was to contact her via text by Wednesday if Mother wanted to visit on the following Saturday. Jessica P. further testified that DCS informed her that Mother was only to visit with the children if Mother submitted a negative drug screen. In addition to the visit on May 14, 2016, the record shows that Mother requested two other visits during this period of time, one in February 2016 and one for May 7, 2016. Both requests were denied, however, because Mother failed to comply with DCS's requirement that she submit to a drug screen. Although "[a] parent's failure to visit may be excused by the acts of another" when "those acts . . . constitute a significant restraint or interference with the parent's attempts to visit the child," *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citing *In re Audrey S.*, 182 S.W.3d at 864) we conclude that the limitations placed on Mother's attempts to visit Tailor did not constitute a "significant restraint or interference." Mother simply failed to take the steps necessary to visit Tailor. At trial, Mother testified that she had difficulty making it to appointments and visitations because she did not own a vehicle. Mother admitted, however, that she did have access to a vehicle; she just had to make arrangements to use it. Mother's visits were infrequent enough that on April 25, 2016, DCS noted that "[t]here is concern that there is no bond between [Mother] and Tailor due to lack of visitations."

The circuit court found that Mother's "visitation during this time frame was token at best." The evidence does not preponderate against this finding, which supports the circuit court's conclusion that Mother's failure to visit was willful. We conclude, therefore, that clear and convincing evidence supports the termination of Mother's parental rights on the ground of abandonment by willful failure to visit during the four-month period prior to the filing of the original petition pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i).

We now consider the circuit court's termination of Mother's parental rights to Tailor based upon abandonment by willful failure to support during the same four-month period. To prove abandonment by willful failure to support, the Petitioners must prove by clear and convincing evidence that Mother "had the capacity to pay support but made

- 9 -

no attempt to do so and did not possess a justifiable excuse." *In re Adoption of Angela E.*, 402 S.W.3d at 641. It is not enough for the Petitioners to "'simply prove that Mother was not disabled during the relevant timeframe' and therefore assume that she was capable of working and paying child support." *In re Noah B.B.*, No. E2014-01676-COA-R3-PT, 2015 WL 1186018, at *9 (Tenn. Ct. App. Mar. 12, 2015) (quoting *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *18 (Tenn. Ct. App. Apr. 17, 2014)).

Mother admitted that she failed to make any support payments for either child. At trial, much of Mother's testimony focused on not having a disability that prevented her from obtaining employment. According to Mother's testimony, she possessed the cooking and cleaning skills to earn a living and had obtained employment in the past utilizing those skills. She obtained employment cooking in a bar in early 2016, but she had to leave that job after less than a month because her probation prohibited her from working there. Mother testified that she was unemployed from March through May or June 2016, when she obtained employment renovating houses. The Petitioners provided no evidence that Mother could have found employment during this time period. Mother, on the other hand, testified that her criminal record made it difficult to find employment, especially employment that her probation officer approved of, "like something that pays me like where I get check stubs." Mother admitted that she bought herself cigarettes, clothes, and makeup but failed to provide any financial support for the children.

Although Mother purchased cigarettes and personal hygiene items and worked in the past, we do not consider that sufficient evidence of Mother's willful failure to support Tailor, which is necessary to satisfy the clear and convincing standard of proof. The Petitioners failed to present enough evidence to "'eliminate[] any serious or substantial doubt'" that Mother had the ability to pay support and that her failure to support Tailor was, therefore, willful. *In re Serenity B.*, 2014 WL 2168553, at *2 (quoting *In re M.J.B.*, 140 S.W.3d at 653).

We, therefore, reverse the circuit court's termination of Mother's parental rights to Tailor based upon the ground of abandonment by willful failure to support.

### B. Severe Child Abuse

The circuit court also terminated Mother's parental rights to both children pursuant to Tenn. Code Ann. § 36-1-113(g)(4), which states:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such

child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Specifically, the circuit court found that Mother committed severe child abuse as defined in Tenn. Code Ann. § 37-1-102(b)(21)(A), (D) (2015).[9] The statute defines "severe child abuse," in pertinent part, as follows:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).[10]

. . . .

(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring[.][11]

1. Douglas

In finding the existence of this ground as to Douglas, the circuit court stated as follows:

Pursuant to Tenn. Code Ann. § 36-1-113(g)(4), [Mother] has committed severe child abuse upon [Douglas] as defined in Tenn. Code Ann. § 37-1-

---

[9] We reference the version of the statute in effect at the time the petition to terminate parental rights was filed. This section has since been amended.

[10] Tennessee Code Annotated section 39-15-402(d) defines "[s]erious bodily injury to the child" as including, but not limited to, "second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects."

[11] Tennessee Code Annotated section 39-17-408(d) provides, in pertinent part:

Stimulants, unless specifically excepted or unless listed in another schedule, means any material, compound, mixture, or preparation that contains any quantity of the following substances having a stimulant effect on the central nervous system:
. . . .

(2) Methamphetamine, its salts, isomers, and salts of its isomers[.]

102(A)(D) when she knowingly exposed him to methamphetamines by the presence of a methamphetamine lab located in the structure she was residing with [Douglas]. As demonstrated in the photographs, marked as exhibits, and the testimony of Agent Darnell, it is clear to the Court that a meth lab existed in the home where Douglas resided. It is very, very fortunate that he was not electrocuted or otherwise damaged in some way by being exposed to methamphetamines. . . . The environment Douglas was living in at the time and Douglas's exposure to that environment constitutes severe child abuse.

Mother argues that the trial court erred in finding clear and convincing evidence that she severely abused Douglas because there is no proof that Douglas was ever "directly exposed" to methamphetamine. We respectfully disagree. The record clearly shows that Mother pled guilty to a Class D felony for unlawfully and feloniously permitting her home to be used for the manufacture of methamphetamine. Moreover, the testimony of Agent Darnell, an expert in clandestine labs, established that law enforcement found an active methamphetamine lab inside a backpack located in Mother's residence. The record also shows that Douglas was present at Mother's residence when the active methamphetamine lab was discovered. Specifically, the record includes a photograph taken by Agent Darnell that shows Mother holding Douglas while law enforcement searched her residence and found the active methamphetamine lab. Agent Darnell testified that Mother's entire residence was exposed to the methamphetamine manufacturing process. As he explained, the methamphetamine manufacturing process produces gasses that enter a structure's ventilation system and then spread throughout the entire structure. Consequently, Agent Darnell concluded that he did not "have any doubt at all" that Douglas was exposed to the methamphetamine manufacturing process that occurred in Mother's home.

In light of this evidence, we conclude that there is clear and convincing evidence that Mother exposed Douglas to severe child abuse, most particularly by allowing him "to be present within a structure where the act of creating methamphetamine" was occurring. Tenn. Code Ann. § 37-1-102(b)(21)(D) (2015). Therefore, the circuit court did not err in terminating Mother's parental rights to Douglas on the ground of severe child abuse.

2. Tailor

The circuit court also terminated Mother's parental rights to Tailor based on the ground of severe child abuse and stated as follows:

Pursuant to Tenn. Code Ann. § 36-1-113(g)(4), [Mother] has committed severe child abuse upon [Tailor] as defined in Tenn. Code Ann. § 37-1-102(21)(A)(D) in that she ingested methamphetamine while pregnant with [Tailor]. She had methamphetamines in her system at Tailor's birth, which

- 12 -

is the reason Tailor was removed from her custody at that time. The Court finds that that constitutes severe child abuse, as well as the fact that her sibling, [Douglas], was exposed to severe child abuse also constitutes severe abuse with respect to Tailor.

Mother asserts that the trial court erred in terminating her parental rights to Tailor based on this ground because the record contains no evidence that Tailor was harmed as a result of being exposed to methamphetamine while in utero. This Court, however, has previously held that a mother's prenatal drug use constitutes severe child abuse "whether or not the child actually sustains harm." *In re Shannon P.*, No. E2012-00445-COA-R3-PT, 2013 WL 3777174, at *5 (Tenn. Ct. App. July 16, 2013). Moreover, "[s]evere abuse can be present even where the child does not manifest any lasting physical effect from mother's use of drugs." *In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *12 (Tenn. Ct. App. Sept. 22, 2016) (perm. app. denied Dec. 16, 2016). Even in instances where a child experiences a healthy childhood, we have found that "the healthy development of the child . . . does not diminish the severity of the harm to which the child was exposed." *In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, *8 (Tenn. Ct. App. Apr. 14, 2005).

In the present case, Mother admitted to using methamphetamine within a month or two of Tailor's birth. Furthermore, Mother tested positive for methamphetamine when Tailor was born. Petitioner Jessica P. testified that Tailor experienced several medical issues immediately after birth. Specifically, Tailor screamed and vomited during the first few days, and her skin "was blood red in color" and "very irritated." Jessica P. further testified that Tailor experienced rapid breathing and a fast heart rate that required her to see a cardiologist. Fortunately, Tailor appears to be healthy and doing well now. Tailor's healthy development, however, "does not diminish the severity of the harm to which [she] was exposed." *In re M.J.J.*, 2005 WL 873305, at *8. We conclude that the record supports the trial court's finding of severe child abuse by clear and convincing evidence based on Mother's prenatal drug use.

In addition, we affirm the circuit court's conclusion that Mother's parental rights to Tailor should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4) based upon Mother's severe abuse of Douglas. Tennessee Code Annotated section 36-1-113(g)(4) provides that "the court hearing the petition to terminate parental rights or the petition for adoption" may terminate a parent's rights if the court finds that the parent "committed severe child abuse against the child who is the subject of the petition *or against any sibling or half-sibling of such child.*" (Emphasis added). The circuit court properly found that Mother committed severe child abuse upon Douglas, Tailor's half-sibling, by allowing him to reside in a structure where the manufacture of methamphetamine occurred. Tenn. Code Ann. § 37-1-102(b)(21)(D) (2015). Accordingly, we conclude that Mother committed severe child abuse upon Tailor based on the circuit court's finding that Mother committed severe child abuse upon Douglas.

- 13 -

## II. Best Interest of the Children

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights to both Douglas and Tailor, we must next consider whether the circuit court properly determined that termination is the children's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878.

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)   Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)   Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).  A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights.  *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

The circuit court found that termination of Mother's parental rights is in the best interest of the children, stating as follows:

1.   [T]he Respondent/Mother . . . [has not] made such an adjustment of circumstances, conduct or conditions as to make it safe and in the Minor Children's best interest to be in [her] home.  The Respondent/Mother continued to test positive for illegal substances and continues to live in, essentially, an unstable environment.  As of today, she does not have suitable housing or suitable long-term employment.  Although she professes to have been clean for at least a year, there is a drug test that would say otherwise as late as February of this year, when she tested positive for marijuana.  Further, there is an outstanding warrant from Texas that she has to deal with. . . .

2.   The Respondent/Mother has been provided services by DCS; however, she has not fully availed herself of the services offered and, therefore, has not successfully complied with the services or case management.  It does not reasonably appear possible that she will make a lasting adjustment.

3.   [T]he Respondent/Mother [has not] maintained any regular visitation or contact with the Minor Children.  Only when this Court ordered specific visitation in June of 2016, did the visits occur with the Respondent/Mother on very stringent regulated terms.  Even though she had been mostly compliant since that time, she did not comply for at least one visit and was late on every one of the other visits.

4.   There is no meaningful relationship that has been established between the Minor Children and the Respondent/Mother . . . due to

- 15 -

the passage of time that has occurred when [she has] not been meaningfully present in the Minor Children's lives.

5.    Due to the lack of visitation and lack of any parental relationship with [Mother] . . . a change of caretaker and physical environment would likely have a negative effect on the Minor Children's emotional, psychological and/or medical condition as the Minor Children have remained in a safe and stable environment since 2014 and 2015, respectively. In the Respondent/Mother's own testimony, she conceded to place these children back with her would have a devastating effect on the Minor Children.

6.    That the criminal history, . . . mental health issues, and drug history of the Respondent/Mother . . . would be detrimental to the Minor Children and [she] is presently unable and [is] unlikely to be able in the future to provide a safe and stable care and supervision for the Minor Children.

7.    [T]he Respondent/Mother [has not] paid child support consistently with the child support guidelines promulgated by the Department pursuant to Tenn. Code Ann. § 36-5-101.

In arguing that terminating her parental rights is not in the best interest of the children, Mother emphasizes her improvement in the months before trial, such as maintaining sobriety and gainful employment for several months. We commend Mother's efforts, but the evidence does not preponderate against the circuit court's finding that she "[has not] made such an adjustment of circumstances, conduct or conditions as to make it safe and in the Minor Children's best interest to be in [her] home." In fact, Mother even testified that she needed more time before the children could be returned to her care because she needed more stability "as far as work and housing." We agree with the circuit court that there is clear and convincing evidence that termination of Mother's parental rights is in the best interest of the children.

For the foregoing reasons, we affirm the circuit court's termination of Mother's parental rights to Douglas on the ground of severe child abuse. We reverse the circuit court's decision with respect to the following grounds for termination of Mother's parental rights to Douglas: abandonment by willful failure to visit during the four-month period preceding the filing of the original petition, abandonment by willful failure to support during the four-month period preceding the filing of the original petition, abandonment by willful failure to visit during the four-month period preceding the filing of the amended petition, and abandonment by willful failure to support during the four-month period preceding the filing of the amended petition.

As to Tailor, we affirm the circuit court's termination of Mother's parental rights with respect to the grounds of abandonment by willful failure to visit and severe child abuse. We reverse as to the ground of abandonment by willful failure to support during the four-month period preceding the filing of the petition.

CONCLUSION

As stated above, we affirm in part and reverse in part the decision of the trial court with respect to the grounds upon which termination of Mother's parental rights to each child is granted. We affirm the circuit court's decision regarding the best interest of the children. The judgment of the circuit court terminating Mother's parental rights to both children is affirmed. This matter is remanded with costs of appeal assessed against the Petitioners, Jeffrey P. and Jessica P., and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE